**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-mj-8078-DLB

UNITED STATES OF AMERICA

v.

MALIK MARTREL MELTON

Defendant.

_____/

FILED BY _____ **SP** _____ D.C.

**Mar 2, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?          ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___ Yes  ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____

John C. McMillan
ASSISTANT UNITED STATES ATTORNEY
District Court No. A0055228
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:       (561) 820-8711
Fax:      (561) 820-8777
Email:   john.mcmillan@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br>MALIK MARTREL MELTON | )<br>)<br>)<br>)<br>)<br>) | Case No.  21-mj-8078-DLB |

*Defendant(s)*

**FILED BY** _____ *SP* ___ **D.C.**

*Mar 2, 2021*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____ 03/12/2018 - 07/13/2020 ____ in the county of ____ Palm Beach ____ in the

____ Southern ____ District of ____ Florida ____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(a)(1)(A) | Dealing in Firearms without a Federal Firearms License |
| 18 USC § 922(g)(3) | Possession of Firearms by an Unlawful User of a Controlled Substance |
| 18 USC § 924(a)(1)(A) | Making False Statements in the Records Required to be Kept by a Federally Licensed Firearms Dealer; and, |
| 21 USC §§ 841(a)(1) | Possession with Intent to Distribute a Controlled Substance (Marijuana) |

This criminal complaint is based on these facts:

Please refer to the accompanying Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Richard Silva, Task Force Officer, ATF
*Printed name and title*

Sworn to before me and signed in my presence via FaceTime
XXXXXXXXX

Date:  3-2-2021

*Judge's signature*

City and state:         West Palm Beach, Florida

Hon. Dave Lee Brannon, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF**
**RICHARD SILVA, TASK FORCE OFFICER**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**
**Case No. 21-mj-8078-DLB**

I, RICHARD SILVA, first being duly sworn, do hereby depose and state as follows:

**Introduction**

1.     I am presently assigned as a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have served in that capacity since January 2011. I am also a duly sworn Deputy Sheriff in and for Palm Beach County Florida. As a TFO with ATF, I have been cross-designated as a Special Deputy United States Marshal and am authorized to conduct investigations and make arrests pertaining to violations of federal law, including violations of the Gun Control Act under Title 18, United States Code, Chapter 44, and all other offenses occurring pursuant to Title 18 of the United States Code. During his tenure as a law enforcement officer, your affiant has made in excess of three hundred arrests pertaining to the use, possession, and/or sale of marijuana. As a consequence, your affiant is extremely familiar with the appearance and smell/odor of burnt and fresh marijuana.

2.     This affidavit is based upon my personal knowledge, review of reports, and information obtained from other law enforcement officials and civilians. This affidavit does not contain every fact of this investigation, only the information believed necessary to support a finding of probable cause.

3.     Your affiant submits this affidavit in support of a Criminal Complaint and an arrest warrant for Malik Martrel MELTON (MELTON) Because this affidavit is being submitted for the limited purpose of obtaining an arrest warrant, it does not contain all the information known regarding this investigation, but rather the facts necessary to establish the requisite probable cause

to believe that Malik MELTON, committed the following offenses: unlawfully dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A); (2) the knowing possession of firearms and ammunition, in and affecting commerce, by an unlawful user of a controlled substance, to wit, marijuana, in violation Title 18, United States Code, Section 922(g)(3); and, (3) the knowing making of false statements in connection with a purchase of a firearm from an Federally Licensed Firearms Dealer (hereinafter "FFL"), in violation of Title 18, United States Code, Section 924(a)(1)(A).

   4. On the basis of my training and experience, your affiant is aware that under federal law, an FFL is obliged to obtain, keep, and maintain in their records for inspection by ATF, a signed Firearms Transaction Record, commonly known as an ATF Form 4473 (Form 4473), whenever a firearm is sold or transferred to an individual who is not themselves a FFL. This form is designed to identify the serial number and type of firearm sold, the seller, the person purchasing the firearm, and whether or not the purchaser is eligible to possess or buy a firearm. Eligibility to purchase a firearm is determined by the person's answers to a series of questions, which in essence cover a list of disqualifying factors under federal law; including, whether the person is a convicted felon, has a history of drug abuse or mental incapacity and whether the person has legal status to be in the United States. Your affiant is further aware that at all times material hereto, that is, from at least as early as March 5, 2018, through the present, question 11.e on Form 4473 asks the firearms purchaser: "Are you an unlawful user of or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside."**

2

(bolding in original). I am further aware that Form 4473 additionally contains a bold font notice directly above the applicant's certification signature line, which specifically warns that:

(a) **"I understand that a person who answers 'yes' to any of the questions 11.b through 11.i . . . is prohibited from purchasing or receiving a firearm;"**

(b) **"I also understand that making any false oral or written statement . . . is a crime punishable as a felony under Federal law"** and,

(c) **"I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law."** (bolding in original).

### Facts in Support of Probable Cause

5.      In May of 2020, ATF began an investigation into the sale of firearms by Malik Martrel MELTON (MELTON). ATF firearms trace records revealed that MELTON had been involved in eight (8) gun traces as the purchaser. Based on your affiant's training and experience this is an atypical amount of firearm traces connected to a particular individual, and is considered as a possible indicator of a person possibly illegally dealing in firearms without a license, as a query of the ATF licensing system conducted by your affiant revealed no FFL having been issued to MELTON at any time by ATF. The earliest trace related to MELTON's activities, according to the ATF trace report, reflected the purchase of a Glock Model 30, .45 caliber semi-automatic pistol, having been purchased by MELTON on April 10, 2018, from Guns and Range Inc., West Palm Beach, Palm Beach County, Southern District of Florida. Your affiant notes that, generally, firearms traces are only initiated through ATF when a firearm is recovered from a crime scene. [1]

---

[1] Your affiant notes that based on his training and experience, ATF firearms traces are typically only conducted as a result of local, state or federal law enforcement queries concerning firearms recovered at crime scenes. However, the fact that a firearm was traced does not necessarily

3

6.    On May 11, 2020, your affiant received copies of several ATF Firearms Transaction Records (ATF Form 4473s) filled out by Malik MELTON from Guns & Range Inc., an FFL operating a store in West Palm Beach, Palm Beach County, Southern District of Florida. Form 4473's for the purchase of firearms were submitted by MELTON for the dates of: 3/12/18; 3/26/18; 4/10/18; 4/19/18; 5/11/18; 6/13/18; 6/19/18; 6/21/18; 6/30/18; 7/2/18; 7/27/18; 7/29/18; 8/8/18; 9/4/18; 10/22/18; 11/23/18; 12/31/18; 2/18/19; 9/15/19; 10/28/19; 12/17/19; 1/7/20; 1/9/20; 1/27/20; 2/4/20; and, 2/22/20.

7.    Based on his training and experience, your affiant is aware that the federal government does not maintain a register of firearms owned or possessed by individual citizens, outside the highly regulated area of National Firearms Act weapons.[2] However, federal law requires FFLs to report sales to ATF in which an individual purchases two or more handguns from a FFL during a period of five (5) consecutive business from the date of original sale. Your affiant noted that a substantial number of the firearms recovered and traced through ATF were identified as having been reported by FFLs as multiple handgun purchases by MELTON, during the period of March, 2018, through May, 2020, reflecting MELTON's purchase of a total of thirty-eight (38) firearms in multiple sales transactions. Your affiant further notes that because multiple purchase forms are among the only types of sales of firearms that are reported to federal authorities, and individual purchases of handguns (outside 5 days from the same FFL), and purchases of long guns, such as rifles, are not reported to ATF, the foregoing 38-handgun figure is not intended to reflect

_____

mean the firearm traced was used to commit a crime. For example, a tracing request might be submitted to ATF for a firearm found in the waistband of a murder victim, or a firearm used by a legally armed citizen in a self-defense shooting.
[2] The National Firearms Act applies only to such firearms as machineguns, short-barreled rifles and shotguns, silencers, and destructive devices.

or document the total number of firearm purchases made by MELTON from FFL's during that time period, but only those reported to ATF on multiple purchase forms.

8.      On June 19, 2020, your affiant received a copy of an ATF Form 4473 filled out by Malik MELTON from Guns & Range Inc., for the purchase of a Sig Sauer, model MCX Rattler, caliber .300 Blackout pistol (an AR-15 variant firearm in pistol configuration), a Smith & Wesson, model M&P 40C, .40 caliber semi-automatic pistol, and a Glock, model 45, 9mm, semi-automatic pistol. The ATF Form 4473 was completed and signed by Malik MELTON at Guns and Range Inc., West Palm Beach, Palm Beach County, Southern District of Florida, on June 13, 2020.

9.      On July 13, 2020, your affiant and ATF SA Mark Finnamore met with MELTON at his residence at 898 Cotton Bay Drive, Apt. 2213, West Palm Beach, Palm Beach County, Southern District of Florida, and requested to speak to MELTON regarding his recent firearm transactions. MELTON voluntarily agreed to provide a statement and invited agents inside his apartment. Your affiant recorded this meeting. Your affiant informed MELTON that there was an issue with the paperwork relating to a July 9, 2020, firearm transaction. MELTON advised that he was aware that there might be a problem, because on July 9, 2020, when he attempted to pick up the firearms he purchased, the employees of Guns & Range Inc. informed him that there was an issue with the National Instant Criminal Background Check System (NICS) approval, so Guns & Range Inc. would not release the firearms. Your affiant asked to view MELTON's identification card and concealed weapons permit, and MELTON replied that both items were in his vehicle in the parking lot. Your affiant inquired as to MELTON's source of income, and MELTON replied that he had been employed at the Drive Shack in West Palm Beach as a cook since September, 2019. According to MELTON, he regularly worked forty hours per week at $13.00 per hour. MELTON added, however, that his hours have decreased due to Covid-19 closures. Your affiant

5

asked MELTON for the amount of his last paycheck, and MELTON voluntarily logged onto an ADP application on his red Apple iPhone cellular device and displayed a list of recent paycheck stubs. Your affiant asked if he could take a photograph of MELTON's recent paystubs, and MELTON agreed. According to the banking information MELTON provided, his monthly income was approximately $1,400.00 per month. Your affiant asked MELTON if he had any secondary employment, and MELTON replied that he had no other employment.

10.     Your affiant asked MELTON how many firearms thought he had purchased in his lifetime, to which MELTON responded, "I owned a lot." Your affiant asked MELTON what he meant by "a lot," and MELTON said, "I believe forty, because when new guns come out, I get them, if I don't like them, then I end up just selling them, the way they feel in my hand, I'm really a Glock guy." Your affiant asked MELTON to clarify his response, and MELTON stated he had purchased approximately (40) forty firearms since 2018. Your affiant inquired of MELTON as to how many of the "40" firearms that MELTON had purchased recently were still in his (MELTON's) possession, to which MELTON replied that he had still had 4 of those firearms at his residence. Your affiant asked MELTON if he maintained records of his firearm transactions, and MELTON explained that he might have some files either in his bedroom or possibly saved on his Apple cellular device. Your affiant asked MELTON how many times has he filled out ATF Form 4473, and MELTON replied, "more than enough to know not to make the same mistake."

11.     Your affiant asked MELTON if he believed he would pass or fail a marijuana drug test, to which MELTON replied that he would pass the test because he has not smoked marijuana since high school. [3]

_____

[3] Your affiant notes that prior to the initiation of this interview, your affiant had reviewed MELTON's publically accessible Instagram.com account and had observed numerous images

6

12.      Your affiant provided MELTON a copy ATF Firearms Transaction Record (ATF Form 4473) from Guns & Range Inc. The 4473 form was completed and signed by MELTON at Guns & Range Inc., an FFL located in West Palm Beach, Florida, Palm Beach County, Southern District of Florida, on June 13, 2020. Your affiant asked MELTON to read question 11.a aloud, which states, "Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. Yes/No." Your affiant asked MELTON if he understood this question, to which MELTON responded in the affirmative. MELTON explained the meaning of this question was that, "you are not purchasing the firearm for someone else; you are the person who's buying the firearm for yourself."

13.      At this time, your affiant informed MELTON of the provisions of Title 18, United States Code, Section 1001, which prohibited making false statements to a federal government agent, which MELTON acknowledged that he understood. Your affiant informed MELTON that firearms that he has purchased were recovered in various crimes throughout Palm Beach County, to which MELTON replied, "shit." MELTON said that he had a few bills of sales saved on his Apple iCloud or in a folder stored in his bedroom. MELTON said that an employee of Guns and Range Inc. had informed him of an ATF trace linking him to a recovered firearm.[4]

14.      Your affiant then inquired of MELTON as to the whereabouts of the Smith & Wesson, model M&P 9C, 9mm semi-automatic pistol, that Guns & Range records establish

_____

which suggested a significant interest in marijuana. Your affiant further notes that MELTON later made statements to your affiant and SA Finnamore which contradict this statement.
[4] Since the final stage of most ATF firearms traces involves the ATF National Tracing Center personnel contacting the last known FFL to determine the identity of the traced firearm's purchaser, the FFL, and/or its employees, are generally and necessarily aware when a firearm they sold is traced.

7

MELTON purchased on March 12, 2018. MELTON responded that he sold the firearm to an associate known as "Max," a/k/a "Nug." Your affiant asked MELTON how long he had the firearm before he sold it, and he said, "I have no clue."

15.    Your affiant then inquired of MELTON as to the status of a multiple firearm transaction on March 26, 2018, which documented MELTON's purchase of a Glock 17 and Glock 23, from Guns and Range Inc. MELTON responded that he sold both firearms to JF. Your affiant asked whether MELTON possessed a bill of sale for that transaction, and MELTON responded that he did not have one available. MELTON stated he owned both firearms for approximately two months before selling them to JF. MELTON claimed that he stopped shooting .40 caliber ammunition due to the increased cost of .40 caliber ammunition.

16.    Your affiant inquired of MELTON as to the status of the Glock model 30, .45 caliber semi-automatic pistol MELTON was documented as having purchased on April 10, 2018, from Guns & Range Inc., to which MELTON responded, "I have no idea where the Glock 30 went." Your affiant asked if the firearm had been stolen, to which MELTON responded in the negative.

17.    Your affiant asked about the whereabouts of a CZ, model Scorpion, 9mm semi-automatic pistol, MELTON purchased on April 19, 2018, to which MELTON responded that a female associate known as "Paloma" brokered the CZ firearm transaction, which was eventually sold to an unknown male. MELTON was unable to produce a bill of sale for that transaction.

18.     Your affiant asked MELTON if he advertised his firearms online and on websites, and he said, "I use Armslist.com[5] a lot, because of private sales." He further stated that he utilized his Instgram.com account to discuss firearms.

19.     Your affiant then inquired of MELTON as to the status of two, identical Glock model 19 Generation 4, 9mm semi-automatic pistols he purchased on June 13, 2018. MELTON explained that he sold both Glock pistols to an unknown Jamaican male who was from Orlando, Florida. MELTON explained that, "it was a time, like, I was buying too many firearms, I was like, I can't keep all these firearms here, I don't have a safe, and I was like wasting money, and my mom was like you can't keep buying these firearms." SA Finnamore asked MELTON why he did not return the firearms to the gun store, and he said that he did not want to lose money.

20.     Your affiant then inquired of MELTON as to the status of two Kel-Tec, Sub- 2000, .40 caliber semi-automatic rifles, purchased on May 11, 2018, and June 19, 2018, from Guns and Range Inc. MELTON, explained that he pawned one of the Kel-Tec, Sub-2000, rifles at American Pawn in West Palm Beach, Florida. MELTON said that he pawned the Kel-Tec because he needed money. MELTON claimed he could not remember what happened to the second Kel-Tec, Sub-2000, .40 caliber rifle, although it was no longer in his possession.

21.     Your affiant asked MELTON about two Springfield Armory pistols he purchased from Guns and Range Inc. on June 21, 2018, and June 30, 2018. MELTON claimed that he sold all of his Springfield Armory pistols to his friend, "Max."

22.     Your affiant inquired of MELTON about the status of a Smith & Wesson, M & P, 9mm, pistol, MELTON purchased on July 2, 2018, from Guns and Range Inc. MELTON told your

---

[5] Based on your affiant's training and experience, your affiant is aware that Armslist.com is a website which permits users to post classified advertisements for firearms for sale.

9

affiant that he sold the Smith & Wesson, M & P, 9mm, pistol to a friend known as "Tre." MELTON stated that he sold this firearm because he needed money, and was similarly unable to produce a bill of sale for this transaction.

23.    Your affiant inquired of MELTON about the status of a Glock, model 43, 9mm semi-automatic pistol he purchased from Guns and Range Inc. on July 27, 2018. MELTON asserted he sold the Glock, model 43 to an unknown individual on Armslist.com for $450.00. MELTON claimed he owned the Glock, model 43, for approximately one year, before selling it because he wanted a larger firearm.

24.    Your affiant inquired of MELTON as to the whereabouts of another Glock model 43, 9mm pistol MELTON purchased from Guns and Range Inc. one week later, on August 8, 2018. MELTON claimed he bought the second Glock Model 43 as a gift for his brother, JM. MELTON contacted "JM" from his cellular phone in attempt to inquire about the firearms while the phone call was in speakerphone mode. A voicemail was received and no contact was made.

25.    Your affiant then inquired of MELTON as to the status of a Springfield Armory, model XDS, .45 caliber, pistol he purchased from Guns and Range Inc. on July 29, 2018. MELTON alleged this firearm was also sold to his friend, "Max."

26.    Your affiant inquired of MELTON as to the status of a Glock, model 30S, .45 caliber, semi-automatic pistol he purchased from Guns and Range Inc. on October 22, 2018. MELTON claimed that this firearm was supposedly stolen, but that he (MELTON) never reported it stolen because, "I didn't want to go through all of that paperwork." According to MELTON, he left the Glock model 30S in his vehicle, while he was in the Abbey Park area of West Palm Beach, Florida. He left his vehicle unlocked and then left the area in his friend's vehicle. According to MELTON, when he returned with his friend, hereinafter referred to as "PG," MELTON noticed

10

that his Glock pistol was missing. Your affiant asked MELTON if there were any signs of forced entry to his vehicle, and MELTON advised there were none. MELTON contacted "PG" from his cellular phone in attempt to inquire about the Glock 30S, however the PG's phone number was disconnected.

27.     Your affiant inquired of MELTON as to the status of an FN Five-seveN,[6] semi-auto pistol MELTON purchased from Guns and Range Inc. on November 23, 2018. MELTON recalled setting up the deal via Armslist.com and selling to the firearm to an unknown white male in the parking lot of a Home Depot in Palm Beach County for $800.00.

28.     Your affiant inquired of MELTON as to the status of a Glock model 45, 9mm semi-automatic pistol MELTON purchased from Guns and Range Inc. on December 31, 2018. MELTON stated that he sold the Glock pistol to the same individual known as "Tre" from which he had bought his Smith & Wesson, M & P 9mm semi-automatic pistol.

29.     Your affiant inquired of MELTON as to the status of an OD green colored, Glock model 17, 9mm semi-automatic pistol, he purchased from Guns and Range Inc. on February 18, 2019. MELTON could not explain why he sold it, but advised that he also sold this pistol on Armslist.com to an unknown individual.

30.     Your affiant inquired of MELTON as to the status of a Glock, model 48, 9mm semi-automatic pistol, he purchased from Guns and Range Inc. on October 28, 2019. MELTON stated that he sold the Glock 48 to his barber, known to him as "Dread."

31.     Your affiant informed MELTON that the repeated pattern of firearm sales to unknown individuals was concerning, particularly in view of the fact that firearms MELTON purchased were being recovered at multiple crime scenes throughout Palm Beach County. Your

---

[6] Your affiant notes that this is spelling used by FN Herstal, the manufacturer of the pistol.

affiant reminded MELTON of the provisions of Title 18, United States Code, Section 1001, which prohibited making false statements to a federal government agent. Your affiant asked MELTON to be honest, to which MELTON replied, "I'm honest."

32.     Your affiant once again asked MELTON the last occasion he possessed marijuana, and MELTON replied, "two weeks ago." Your affiant informed MELTON that he sought the truth relating to the firearms he has purchased since 2018. Your affiant referred to MELTON by his Instagram.com screen name "Mr.Buddha97" and told him that there has been an ongoing investigation relating to his firearm transactions.

33.     MELTON then explained that on Friday, July 13, 2020, his brother, JM, gave him money to pick up two ounces of marijuana from an individual, who MELTON knew only as "Ant," in the area of Benoist Farms Rd/Okeechobee Blvd. West Palm Beach, Palm Beach County, Southern District of Florida. MELTON said that his friend, "PG," accompanied him to conduct the marijuana transaction. Your affiant asked MELTON to describe the marijuana packaging, and MELTON responded the marijuana had been vacuum-sealed in clear plastic. Your affiant then asked MELTON if he had taken any photos of the marijuana, and MELTON replied that he took a video of the marijuana. Your affiant asked MELTON if he could see the video, and MELTON agreed. MELTON scrolled through his Apple iPhone cellular device and presented a video to your affiant that was date/time stamped Friday, July 13, 2020, 7:19 pm. When requested to play the video, MELTON's voice could be heard on the recording narrating as MELTON held a blue plastic cup containing suspected marijuana as he says, "there it is right there, yes, sir." Your affiant asked MELTON why he opened the clear vacuum-sealed bag of marijuana that was for his brother. MELTON claimed that he removed the marijuana from the bag so his brother could see the marijuana. Your affiant once again asked MELTON if he smoked marijuana, and MELTON again

12

claimed that he did not smoke marijuana, but rather only ate edibles and smoked CBD. MELTON denied having edibles at his residence but offered a photo of the brand of edibles he recently purchased that was saved within his Apple iPhone. The photo depicted a foil bag with the name "Medibles Infused Snacks, 300mg infused treats, THC, Twixx flavor" that had a date/time stamp of July 2, 2020, 3:54 pm. Your affiant asked MELTON when was the last time he ingested edibles and he said "last month." Your affiant asked MELTON how he knew the difference between a candy gummy bear versus a THC infused edible. MELTON explained that when he opens the edible packaging the odor resembled marijuana. Your affiant asked MELTON to describe the effects he experienced when ingesting an edible versus a candy gummy and he stated that the edible gummy assisted him with sleeping.

34.     Your affiant is aware that the term "edible" is common street terminology for cannabis edibles, also known as a cannabis-infused food product that contains cannabinoids, tetrahydrocannabinol (THC). Your affiant is further aware that at all times material hereto THC was and is classified as a Schedule I controlled substance pursuant to Title 21, United States Code, Section 812(c)(17). MELTON explained that he purchased the edibles and CBD oil from a smoke shop located in Fort Lauderdale, Florida. Your affiant asked MELTON which firearms he was carrying while he bought the edibles and CBD oil. MELTON explained that he was in possession of his Glock 19X, but clarified that his firearm remained in his vehicle while he purchased the edibles/CBD oil. Your affiant asked if he had any marijuana in his residence, and he said, "no, you can search." Your affiant asked MELTON how often he was using edibles, and he advised that he had was using edibles once or twice a week since 2016.

35.     As your affiant stepped out of the apartment, MELTON and SA Finnamore discussed high school football. MELTON told SA Finnamore that in 2016, he was involved in a

13

slip and fall accident that resulted in multiple surgeries to his arm. Due to his injuries, his doctor told him that his football career was over. MELTON recalled being depressed and having suicidal thoughts. MELTON said that his doctor prescribed him Oxycodone and Percocet, but he did not like taking pain killers. MELTON explained that, instead, "I started smoking weed, and then I was, like, all right, this is, I'd rather smoke weed than be like depressed all day." MELTON recalled discovering a new passion for firearms during this time of his life.

36.   Your affiant asked MELTON if he was willing to provide consent authorizing agents to search his red Apple iPhone cellular device and his Apple iPad, further advising MELTON that he also had the right to refuse to provide consent. MELTON handed his phone to your affiant and said, "here, do what you gotta do". MELTON also gave agents consent to search his red Apple iPhone and his silver iPad. MELTON offered his passcodes for both devices. Your affiant informed MELTON that he believed that probable cause existed to believe that MELTON was in violation of multiple federal firearm laws, that evidence of such was present on MELTON's cellular phone (based on MELTON's own statements and presentation of photos) and that it was your affiant's belief under the circumstances that if MELTON maintained possession of his cell phone that that evidence would be destroyed.[7]

37.   Your affiant inquired of MELTON as to the status of the Sig Sauer, model MCX, pistol, Smith & Wesson, Model M&P 40C, and Glock, model 45, pistols MELTON purchased from Guns and Range Inc. on June 13, 2020. MELTON stated that his Sig Sauer, model MCX, was in his bedroom, and the Glock 45 was loaned out to his brother, "JM."

---

[7] Your affiant notes that although the defendant voluntarily consented to a search of his cell phone, that in an abundance of caution your affiant also sought and secured a federal search warrant on July 24, 2020, judicially authorizing a search of the digital memory of the aforementioned cellular phone.

14

38.     Your affiant asked MELTON who accompanied him to Guns and Range Inc. when he picked up the three firearms on June 13, 2020. MELTON said that he drove to Guns and Range Inc. alone in his mother's Honda Civic. Your affiant presented MELTON with exterior video footage obtained from Guns and Range Inc., that depicts MELTON arriving at the Guns and Range Inc. on June 13, 2020, at 3:35:18 p.m., in a blue Kia. Your affiant asked MELTON for the identity of the driver of his vehicle, to which MELTON responded, "Derrick," but he was not familiar with his last name and could not provide a phone number for Derrick. Your affiant asked why Derrick remained in his vehicle while he entered to the business alone to purchase three firearms, to which MELTON responded, "I don't know."

39.     Based on the MELTON's admissions to your affiant and SA Finnamore of the possession of firearms and ammunition by an unlawful user of a controlled substance, to wit, THC infused edibles, in violation of Title 18, United States Code, Section 922(g)(3), and accordingly, making of false statements in connection with a purchase of a firearm, in violation of Title 18, United States Code, Sections 922(a)(6) and 924(a)(1)(A), your affiant informed MELTON that he was seizing his firearms due to multiple federal violations existing.    Your affiant seized the following firearms from MELTON:

      a.     Sig-Sauer, PMCX Rattler, 300 blackout, pistol.

      b.     Bravo Company, model NCM4, multi-caliber, rifle.

      c.     American Defense Manufacturing, multi-caliber, pistol

40.     MELTON stated that his Glock, model 19X, 9mm semi-automatic pistol, was located inside his rental car's glovebox. MELTON explained that his brother rented him a black Ford Mustang convertible because the Honda Civic he regularly drove was broken down. MELTON walked towards the unlocked the Ford Mustang doors, and he opened the door for your

15

affiant. Your affiant seized the loaded Glock, model 19X, 9mm pistol, in a camouflage Kydex holster, from the location identified by MELTON, observing the pistol to be located directly next to a yellow plastic tray containing what your affiant recognized as marijuana stems and residue. Your affiant is aware that trays with residue are commonly used as a processing station for marijuana to prepare for street-level sales. Within the center console, your affiant located three folded bundles of U.S. Currency in the glovebox totaling $1,300.00. MELTON claimed the cash, and it was immediately released to him.

41.     After your affiant recovered the Glock 19X, your affiant looked through the clear front passenger window of MELTON's other vehicle, the Honda Civic bearing FL Tag# BIMZ07, and observed a blue plastic cup in the center console that resembled the cup containing marijuana in MELTON's Instagram post dated July 10, 2020.

42.     MELTON confirmed that the cup your affiant noticed was the actual cup he was holding that was in the Instagram.com video that contained marijuana. MELTON retrieved a spare key for the Honda, and he gave agents permission to enter the vehicle to photograph the plastic cup in the center console.

43.     Once your affiant opened the front passenger door of MELTON's vehicle, he immediately detected a very strong odor, which your affiant immediately recognized, based on his training and experience, to be that of burnt marijuana. Your affiant informed MELTON that the interior of the vehicle had an overwhelming distinct odor of burnt marijuana. MELTON responded, "if there is, there is, you can check it." Due to the strong odor of marijuana coming from the interior of the Honda Civic, a search of the vehicle was conducted. Your affiant searched the vehicle and located a clear plastic sandwich bag containing a green leafy substance weighing

approximately 14.8 grams (TPW) of marijuana. The marijuana was later tested utilizing a PBSO-issued test kit, which confirmed that the substance was marijuana.

44.     SA Finnamore asked MELTON who had last driven the Honda Civic, to which MELTON responded that it had last been his brother JM who had the vehicle, before returning it to MELTON. Your affiant asked MELTON if he would provide a sample of his DNA for investigative purposes so agents could compare his DNA to the plastic bag containing 14.8 grams of marijuana that was located in the glove box. MELTON stated that he touched the bag of marijuana that was located in the glove box because that was the same bag within his Instragram.com video post. Based on his past experience conducting hundreds of traffic stops involving the possession of the marijuana, your affiant also noticed particles of loose marijuana scattered throughout the driver's side and front passenger floorboard. SA Finnamore asked MELTON if he would pass or fail a drug test and he stated, "I don't know, I do eat edibles, so if it pops up, it pops up."

45.     Your affiant read MELTON question 11.a of the ATF Form 4473 ("Are you the actual transferee/buyer of the firearm(s) listed on this form?") and expressed his concerns regarding all of his firearm transactions and the fact that MELTON's statements did not add up. Your affiant asked MELTON if he lied on question 11.a and MELTON admitted to falsifying question 11.a. Your affiant then asked how much profit MELTON made from each sale, and MELTON told your affiant that he made $50-$100 profit per firearm that he has sold. MELTON stated that he was selling firearms for supplemental income, and he did not think it was that serious.

46.     Once at the ATF West Palm Beach Field Office, your affiant conducted a field test on the suspect marijuana located inside the glovebox using a PBSO-issued test kits which

17

confirmed that the substance was marijuana. Your affiant also queried the Regional Automated Property Information Database for firearms pawned by MELTON and the search was negative.

47.     On July 19, 2020, your affiant received a voice mail message on his ATF-issued cellular phone from MELTON, in which MELTON stated he remembered he had left the sum of $500 in cash stored inside the pistol grip of the American Defense firearm your affiant had taken into evidence on July 13, 2020.  Your affiant located the money, photographed it, and attempted to make contact with MELTON at the phone number provided by MELTON on several occasions thereafter without receiving a response. On July 29, 2020, your affiant contacted MELTON's brother, MM,[8] via cell phone and inquired if MM was available for a voluntary interview.  MM agreed to meet at the ATF West Palm Beach Field Office on July 30, 2020.  Your affiant asked MM if he could have MELTON contact your affiant regarding the release of certain items of property. MM informed your affiant that his brother (MELTON), was sitting next to him.  Your affiant made arrangements with MM to meet for purposes of the interview, and MM agreed to accompany his bother (MELTON) to the ATF West Palm Beach Field Office on July 30, 2020.

48.     On Thursday, July 30, 2020, at approximately 10:40 am, your affiant and SA Finnamore met with MELTON at the ATF West Palm Beach field office regarding the release of two rifle bags and U.S. currency that was located within the grip of his rifle that was seized on July 13, 2020. This meeting was recorded. Your affiant told MELTON that he wanted to know about firearms he (MELTON) had purchased for others. MELTON replied, "so I never, I never purchased a firearm for somebody else, like for no specifically reason, I purchased a firearm, I sat on it, and then I contacted somebody and said I needed some money, sell a firearm, like, I know

---

[8] Your affiant notes that MM is not the same brother previously identified as being involved in the marijuana transaction above.

somebody is looking for a gun, I never questioned anything because the State of Florida law is so lenient."

49.    Your affiant asked MELTON if he was aware of the term "FFL." MELTON replied, "yes, a licensed dealer and, uh, I kind of looked into it, like, S-O-T,[9] cause I thought about, you know, being in a partnership with somebody. He makes holsters and suppressors and everything." Your affiant asked MELTON if he has ever applied for an FFL, and MELTON replied, "I never applied, I never like, I never liked, but you know," Your affiant asked MELTON if he knew what the purpose of an FFL was, and he replied, "to be like a license arms dealer."

50.    Your affiant presented MELTON with a screenshot of an Instagram video of himself holding a Glock 19X in his left hand, approximately 30-40 pre-rolls[10] within a clear plastic bag hanging from his mouth (valued at $500.00), and approximately three thousand dollars in his right hand. Your affiant asked MELTON how much profit he made from the clear plastic bag containing pre-rolls of marijuana, and MELTON stated he made $200.00 profit selling the pre-rolls individually. Your affiant then asked MELTON where he received the three thousand dollars and MELTON admitted to fraudulently obtaining a COVID-19 relief loan in the amount of twenty thousand ($20,000) dollars from the U.S. Small Business Administration (SBA).

51.    Your affiant asked MELTON if he deleted his Instagram account "Mr. Buddha97" after agents interviewed him on July 13, 2020. MELTON responded, "I just wanted to delete it, I thought about deleting it anyways, you guys got what you needed anyways, you already plugged everything, you can get everything no matter what." Your affiant asked MELTON if he was

---

[9] Your affiant knows the term "SOT" is an acronym for a "Special Occupational Taxpayer," a special sub-category of FFL who are further licensed to manufacture weapons subject to the National Firearms Act such as machineguns, silencers, and destructive devices.
[10] Machine produced marijuana cigarettes.

concerned about his incriminating Instagram activity. MELTON said, "incriminating, yeah, just weed, yeah, just talking to people about weed, I'm not going to lie, yes."

52.    Your affiant told MELTON that he is prohibited from possessing firearms as a user of a controlled substance such as marijuana. MELTON said he wanted to be honest and said, "I'm going be honest with you. So like with this whole corona thing that's going on. I have no fucking money. So I made a couple of phone calls. I need to make some money. The only way I know is that people are still smoking weed. So I literally just start selling weed.

53.    Your affiant asked MELTON if he always carried his firearm on his person, and he replied, "most of the time, yes, but when I have weed with me, I don't carry a firearm." MELTON further explained, "my gun is never, like whenever I deal with weed, and all that stuff, I never have weed with me, most of the time." MELTON further stated, "the time I had the gun with me; I was going to the gun store, I had the pre-rolls with me because I just got them." MELTON told agents that most of his drug transactions occurred at his job or various public places, but never at his residence.

54.    TFO Siva asked MELTON if his mother was aware of his involvement with the ATF because she contacted ATF inquiring about the agent's interviewing him at her residence. MELTON said, "she wants to know, that's the problem she doesn't know my second lifestyle. She doesn't know that I'm out here, that I'm always out here selling weed and giving people guns or, or selling guns to the other people or, you know?"

55.    On July 27, 2020, your affiant sought and obtained search warrants for MELTON's cellular devices that were seized on July 13, 2020. On July 29, 2020, PBSO Forensic Detective Paul Indovina examined MELTON's Apple iPhone Model: N104AP, IMEI: F4GCPA0ZN72T., which was obtained from MELTON. Your affiant reviewed approximately 3,443 videos within

20

the provided cellular extraction report and noted three videos created by MELTON's cellular device under the file names: IMG_3205, IMG_3206, and IMG_3208.

56.     According to the metadata attached to the file saved as IMG_3205, said video was created on June 13, 2020,11: 18 AM, (UTC-4).  In that video, MELTON is observed holding a clear plastic bag containing approximately forty pre-rolled marijuana cigarettes on his lap, wearing a dark-colored baseball cap, long-sleeved blue shirt, and black pants, while he states, "yes sir, yes sir, hit my line, you know what time it is."

57.     According to the metadata attached to the file saved as IMG_3206, said video was also created on June 13, 2020, at 11:24 AM (UTC-4).  In that video, MELTON is depicted as a passenger in a vehicle in which a person identified as "DM" is in the driver's seat. The driver DM, who was later identified as a convicted felon, and MELTON, are dancing in the vehicle. DM is in possession of a black semi-automatic pistol and points the firearm at the camera.  Your affiant noticed a clear plastic bag containing approximately forty pre-rolls of marijuana on his side next to the center console of the vehicle.

58.     Your affiant located an additional video saved under filename: IMG_3208, also created on June 13, 2020, 3:29 PM (UTC-4). The video appeared to be a screen recorded video of DM's Instagram account that depicts MELTON seated in the front passenger seat of a vehicle with the same attire. The driver, DM states, "stop playing with that man," as MELTON responds, "I'm on that nigga, you all see that nigga, you all see that racks, man stop playing that pussy ass nigga, OTH down for real, fuck nigga, you thought I was the only one in the car it's up there, and it's stuck there." As MELTON makes this statement in the video, he holds a Glock 19X in his left hand. He points the firearm at the cellphone camera, approximately forty pre-rolls of marijuana

within a clear plastic bag hanging from his mouth and several cash bundles of cash in his right hand.

59.    It should be noted that on June 13, 2020, MELTON purchased a Sig Sauer, model MCX Rattler, .300 blackout pistol (an AR-15 variant firearm in pistol configuration), a Smith & Wesson, model M&P 40C, semi-automatic pistol, and a Glock, model 45, 9mm, semi-automatic pistol, from Guns & Range Inc.   In the course of his investigation, your affiant obtained exterior video footage from Guns and Range Inc. that depicts MELTON arriving at the Guns and Range Inc. on June 13, 2020, at 3:35 PM,  in a blue Kia. MELTON is observed exiting the vehicle's front passenger side wearing a black baseball cap, long-sleeved blue shirt, black pants, and dark-colored sandals, all items consistent in appearance with MELTON's attire in the aforementioned video recordings created on that same date. The driver of the vehicle remained in the driver's seat as MELTON entered the business. Once MELTON completed the firearm transaction, he exited the business and was observed carrying multiple gun boxes. An employee from Guns and Range, hereinafter referred to as "RC," was observed leaving the business to speak to MELTON and then greets the vehicle's driver. MELTON placed the gun boxes in the trunk of the car and then entered the Kia's front passenger side. The vehicle departs from the business, and "RC" returns inside the business.

60.    Your affiant reviewed approximately 4,000 text messages within the provided cellular extraction report.  Your affiant noted the following text communication dated **June 13, 2020, at 9:40 PM**, between MELTON and a contact saved within his cellular device as "No Cap No Cap" hereinafter referred to as "NC:"

MELTON: Who need pre rolls man

NC: how much

22

MELTON: 20

NC: ight, send a pic.

MELTON: Two video files were sent as multi-media attachments that depict MELTON holding a marijuana pre-roll in his hand.

61.     TFO Silva noted the following text communication dated April 30, 2020, 7:36:04 PM(UTC-4), between MELTON and an unsaved contact within his cellular device. MELTON sent an image of a Glock 19, saved under the file name: 60998255370__59212702-C5AF-4273-9F87-1B8B0E504EBF.JPG. At 7:36:58 PM(UTC-4), the recipient responds, "how much." At 7:37:19 PM(UTC-4), MELTON replies, "She gone only had her for 20 mins lol 550."

62.     Based on your affiant's training and experience, marijuana is a schedule 1 controlled substance under federal law. In the State of Florida, edible medical marijuana is permitted by Florida state law, however recreational use of marijuana is illegal in the state of Florida. In an abundance of caution your affiant queried the State of Florida  medical marijuana registry to determine if MELTON had a medical marijuana card.  A medical marijuana records check revealed that as of September 25, 2020, Malik Martrel MELTON was not authorized to possess tetrahydrocannabinol (THC) cannabis medical marijuana or delivery devices.

63.     On Friday, December 18, 2020, at approximately 5:07 pm, your affiant received a voice mail message on his ATF-issued cellular phone from Malik MELTON requesting to speak to your affiant and that it was "urgent." Your affiant returned the call and recorded the conversation. MELTON asked to meet with your affiant to discuss the investigation. Your affiant told MELTON that he was not available at the time but offered to meet him the following week.

64.     MELTON asked your affiant if he may purchase firearms because he did not have his concealed weapons permit as it was seized on July 13, 2020, by your affiant. Your affiant told

23

MELTON that he was prohibited from possessing firearms if he possessed marijuana and smoked pre-rolls of marijuana. Your affiant asked MELTON if he recalled the pre-rolls of marijuana he had. MELTON replied, "I'm not smoking, so that's, I'm not worried about that." Your affiant asked MELTON if he knew what was inside the pre-rolls he possessed. MELTON replied, "so the problem is the marijuana, that, that I had the gun with, I understand." Your affiant confirmed that was the issue. Your affiant and MELTON agreed to meet on January 7, 2021, at the ATF West Palm Beach Field Office for an additional interview to clarify his statement. At this time, the phone call concluded.

65. On Thursday, January 7, 2021, at approximately 5:40 pm, your affiant and ATF SA Michael James met with MELTON at the ATF West Palm Beach field office regarding the additional interview MELTON had requested. This meeting was recorded. Your affiant read MELTON his constitutional *Miranda* warnings from a PBSO issued *Miranda* rights card, and MELTON acknowledged that he understood his rights. He signed and dated the *Miranda* card. Your affiant told MELTON that he was hoping MELTON would explain further details relating to his firearms and the Small Business Administration (SBA) loan he fraudulently obtained. MELTON responded, "What does that have to do with the SBA loan?" Your affiant informed MELTON that fraudulently obtaining a twenty thousand dollar SBA loan from the U.S. government was a crime. Your affiant further informed MELTON that MELTON had purchased numerous firearms within the past two years which remained unaccounted for, which was an issue.

66. MELTON said that he purchased firearms for multiple people, and the conversations were within his cellular device. He informed your affiant that he bought several

24

firearms for an associate known as "XX."[11] MELTON said he purchased the firearms for XX because he (XX) was not old enough to buy firearms himself. MELTON recalled purchasing XX multiple Glock Model 17s and 19s, as well as a Smith & Wesson, Model M&P 9C. According to MELTON, he purchased two Glock Model 19s during one visit to Guns & Range of West Palm Beach, Florida. MELTON said one of three identical Smith & Wesson Model M&P 9Cs he purchased at Shoot Straight of West Palm Beach in 2018 was sold to XX. MELTON said XX gave him cash before each firearm transaction, and the firearms were never intended for MELTON himself. Your affiant presented ATF Form 4473 that MELTON completed and signed dated March 12, 2018, where he purchased a Smith & Wesson Model M&P9C. Your affiant read question 11a and then asked MELTON if he falsified the form and MELTON confirmed he did falsify this form.

67.     Your affiant reviewed records he obtained from Guns & Range Inc., an FFL operating a store in West Palm Beach, Florida. Your affiant located a multiple firearm transaction where MELTON purchased two Glock Model 19 Gen. 4, 9mm caliber, semi-automatic pistols on June 13, 2018.

68.     MELTON said that he also purchased a Smith & Wesson Model M&P 40, semi-automatic pistol for an associate of his he knew as "Isaac." MELTON recalled purchasing the Smith & Wesson Model M&P 40C, .40 caliber, from Shoot Straight for approximately $250.00, and that he thereafter sold the pistol for $350.00, which would therefore have resulted in a profit of $100.00. Your affiant presented MELTON with records obtained from Shoot Straight of West Palm Beach indicating that he purchased three identical Smith & Wesson Model M&P 40C, .40

---

[11] Because the identity of the buyer may concern an ongoing investigation, that identified subject's name has been redacted herein and replaced by "XX" which do not reflect the actual initials of that identified subject.

caliber semi-automatic pistols, between March 31, 2019, through January 14, 2020. MELTON stated he did not recall the serial number or date he sold the firearm to Isaac. Your affiant asked why Isaac did not purchase the firearm from the FFL himself, and MELTON said that Isaac would not pass the background investigation.

69.    MELTON stated that he also purchased a Glock model 17 and a Smith & Wesson, model M&P 40C, .40 caliber, semi-automatic pistol for another male he referred to as "Stefan's cousin." MELTON was not aware of the purchaser's name but was aware of him being in a prison work release program, and added that he ("Stefan's cousin") also possessed a medical marijuana card. Your affiant once again presented MELTON with records obtained from Shoot Straight of West Palm Beach indicating that he purchased three identical Smith & Wesson model M&P 40C, pistols, between March 31, 2019, through January 14, 2020. MELTON did not recall which of the three specific firearm he sold to "Stefan's cousin."

70.    MELTON said that he also sold a Glock, Model 19, semi-automatic pistol to his friend known as "Stefan." MELTON could not provide a last name for Stefan. Your affiant asked why Stefan did purchase the firearm by himself from an FFL, and MELTON advised that he understood Stefan was a convicted felon.

71.    Your affiant asked MELTON why he was dealing marijuana, and he said, "I needed money. I'm done selling guns because it's going to catch up, and I'm here now, and it caught up." MELTON continued, stating, "I told my girl, I'm done selling guns, and she was like, 'what do you mean?' she didn't know, she doesn't really know. I would buy guns and not have the money to actually pay my next bill. So I would be obligated to sell a gun. So, I can't sell a gun for less, because, I want to at least make some profit, something that I would go sell on the streets." Your affiant asked MELTON if he purchased any additional firearms since agents seized his concealed

26

weapons permit in July, 2020. He said that he did purchase a Glock, model 19X, semi-automatic pistol for protection purposes. Your affiant asked MELTON if he was still dealing marijuana, and he said that he was not. MELTON advised that he has changed his lifestyle and he does not smoke marijuana anymore.

72.     MELTON further admitted to making a false statement on July 13, 2020, when he informed your affiant that the 14.8 grams of marijuana located in the glove box of his mother's Honda Civic was his brother's marijuana. MELTON explained that he purchased four ounces of "exotic weed" for $800.00. He sold two ounces of marijuana for $250.00, and he gave away the remaining two ounces. MELTON told your affiant that marijuana seized on July 13, 2020, inside the Honda Civic glove box was leftover from the aforementioned four-ounce "exotic weed" purchase.

73.     Your affiant asked MELTON about other narcotics he sold on the streets, and said he also sold liquid codeine, commonly known as "lean," that was prescribed to him. MELTON said that he packaged the liquid yellow-colored liquid codeine in a plastic bag, and he sold the liquid codeine to his friends on two occasions for $60.00.

74.     On the basis of the foregoing, your affiant respectfully submits that probable cause exists to charge Malik MELTON with the following violations of federal law, to wit: (1) unlawfully dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A); (2) the knowing possession of firearms and ammunition, in and affecting commerce, by an unlawful user of a controlled substance, to wit, marijuana, in violation Title 18, United States Code, Section 922(g)(3); and, (3) the knowing making of false statements in connection with a purchase of a firearm from an Federally Licensed Firearms Dealer (hereinafter "FFL"), in violation of Title 18, United States Code, Section 924(a)(1)(A).

27

FURTHER YOUR AFFIANT SAITH NAUGHT.

RICHARD SILVA
TASK FORCE OFFICER
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES

ATTESTED TO ME TELEPHONICALLY
(FACETIME) BY THE APPLICANT IN
ACCORDANCE WITH THE REQUIREMENTS
OF FED. R. CRIM. P. 4.1 THIS __2nd__ DAY OF
MARCH, 2021.

**HON. DAVE LEE BRANNON**
**UNITED STATES MAGISTRATE JUDGE**

28